# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 22-1357V

|  |  |
|---|---|
| KATHLEEN KADLEC, | Chief Special Master Corcoran |
| Petitioner, | Filed: February 9, 2026 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC, for Respondent.*

### **RULING ON ENTITLEMENT**[1]

On September 23, 2022, Kathleen Kadlec filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 9, 2019. ECF No. 1 at 1 ("Petition").

After review of the record and consideration of the parties' arguments, I conclude that Petitioner has established by preponderant evidence that the situs of vaccine administration was her injured arm, and that her pain and reduced range of motion were

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

limited to her left shoulder. Petitioner has also established all other requirements for a Table SIRVA, and she is therefore entitled to compensation.

## I.    Procedural History

On November 7, 2022, this case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). ECF No. 8. An initial status conference was held on January 25, 2023. On November 17, 2023, Respondent filed a Rule 4(c) Report setting forth his position that compensation would not be appropriate under the Vaccine Act. ECF No. 23 ("Rule 4(c) Report").

On July 30, 2024, I entered a scheduling order setting deadlines for briefing and for Petitioner to file any additional evidence. ECF No. 28. Petitioner filed a motion for a ruling on the record on September 13, 2024. ECF No. 29 ("Pet'r Mot."). Respondent filed a response on December 27, 2024. ECF No. 33 ("Resp't Opp'n"). Petitioner did not file a reply in support of her motion. This matter is ripe for adjudication.

## II.    Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.    Petitioner's Vaccination and Initial Complaint of Left Shoulder Pain

At the time of vaccination, Petitioner was 42 years old. Ex. 1 at 2. Prior to vaccination, Petitioner had been treated for left-sided flank pain, urinary issues, sinus pain and pressure, and a concern about a potentially-enlarged lymph node on the left side of her neck. Ex. 2 at 92, 95, 101, 110, 122, 125, 131, 134. Petitioner was seen fairly frequently by Dr. Alan Christianson, her primary care provider ("PCP"). Petitioner did not have any prior injury or pain in her left shoulder.

On October 9, 2019, Petitioner received a flu vaccine at Dr. Christianson's office that was administered by Sheryl Stercho, a licensed practical nurse ("LPN"). Ex. 1 at 2. LPN Stercho completed a computer-generated vaccine administration record and selected the option for "*right* deltoid" as the site of administration. *See id.*

Over a month later, on November 20, 2019, Petitioner saw orthopedist Dr. Bryan Lee at Excela Square Latrobe – Orthopedics and Sports Medicine ("Excela Orthopedics") for a complaint of *left* shoulder pain. Ex. 3 at 5. Petitioner reported that her pain had been

ongoing for six weeks and had started "immediately after receiving a flu vaccine in the left shoulder as well." *Id.* Petitioner stated that the vaccination seemed to go deep into her shoulder and felt that she had been "stuck in [the] bone with [the] needle." *Id.* In terms of symptoms, Petitioner described pain, a loss of range of motion ("ROM"), and "some occasional numbness and tingling that does go down to the middle and index finger primarily." *Id.*

Based on Petitioner's limited ROM, tenderness, and positive impingement signs, Dr. Lee specifically diagnosed Petitioner with SIRVA. Ex. 3 at 6. He prescribed a short course of oral steroids, and also recommended physical therapy ("PT") and steroid injections, although Petitioner indicated that she did not want any type of further injection.[3] *Id.* Dr. Lee indicated that Petitioner should follow up in two weeks, but she did not return at that time. *See id.*

Petitioner next complained of left shoulder pain to Dr. Christianson at a wellness checkup on February 11, 2020. Ex. 2 at 86. Petitioner reported "left sided neck pain and left shoulder pain that is worsening." *Id.* Petitioner had been performing left shoulder exercises, but "the pain in the shoulder, collarbone area, and lower left neck base persist." *Id.* Petitioner also remained concerned about the size of the lymph node on the left side of her neck. *Id.*

After reviewing Petitioner's symptoms, Dr. Christianson stated that, "[t]he SIRVA diagnosis indicated by Dr. Lee in his consultation is still felt to be the primary issue." Ex. 2 at 89. However, due to a lack of resolution of the injury, Dr. Christianson ordered an MRI to investigate the rotator cuff. *Id.* Dr. Christianson also ordered an MRI of the soft tissues of Petitioner's neck based on her complaints of left-sided neck discomfort associated with swallowing and her persistent concern about her lymph node. *Id.*

Petitioner underwent these MRIs on March 6, 2020. The left shoulder MRI showed "[m]ild degenerative changes of the acromioclavicular joint, with trace subacromial-subdeltoid bursitis." Ex. 2 at 70. Petitioner did not have any rotator cuff tears or other pathology.[4] Ex. 2 at 70.

## B.      Petitioner Reports Continued Neurologic Symptoms and Undergoes Testing

Petitioner's next follow-up was not until June 22, 2020, when she returned to Dr.

---

[3] Dr. Lee took x-rays of Petitioner's shoulder, which were unremarkable. Ex. 11 at 3.

[4] Petitioner's anterior superior labrum was absent, but the interpreting physician noted that this was a normal anatomic variant. Ex. 2 at 70.

Christianson. Ex. 2 at 79. At this appointment, Petitioner reported constant left shoulder pain and that the "paresthesias in the fingers 2,3,4 ha[ve] persisted and more recently extended to involve all fingers." Petitioner also felt "more weak and clumsy now in the left hand." *Id.* Additionally, Petitioner stated that the pain radiated down her left arm into the hand and sometimes seemed to involve the left trapezius muscle. *Id.*

Dr. Christianson's assessment was that "[t]here are both neurologic symptoms and musculoskeletal symptoms here." Ex. 2 at 81. He ordered a nerve conduction study ("NCS"). *Id.* Dr. Christianson also suggested that a cervical spine x-ray and MRI might be required after the NCS was completed. *Id.*

On July 8, 2020, Petitioner saw Dr. Bill Hennessey, a physical medicine and rehabilitation specialist. Ex. 7 at 2. Dr. Hennessey performed the NCS and an electromyogram ("EMG"). *Id.* This testing did not reveal any abnormalities – Petitioner had "textbook normal peripheral [NCS] as well as a normal EMG needle examination." *Id.* On this basis, Dr. Hennessey ruled out left cervical radiculopathy, a flu vaccination-induced neuralgic amyotrophy, and carpel tunnel syndrome. *Id.* at 3. Dr. Hennessey thus had "no diagnosis for her non-anatomic intermittent left hand numbness" but "[did] not suspect any central or peripheral nervous system pathology."[5] *Id.*

### C.    Petitioner Receives Further Orthopedic Treatment and PT

Petitioner returned to Excela Orthopedics on July 23, 2020, and was seen by orthopedist Dr. Gregory Lauro. Ex. 4 at 5. Dr. Lauro reiterated much of the history that Petitioner had reported to Dr. Lee, including that Petitioner "felt an unusual pain" when the vaccine was administered and "felt that it was put in somewhat harder than normally flu inoculations are done." *Id.* Further, Dr. Lauro noted that since the time of vaccination, Petitioner "has had pain in her left shoulder." *Id.*

Petitioner reported to Dr. Lauro left shoulder pain, a "catching sensation" in the shoulder, and a "tingling sensation" in her arm with pain that radiated down to her hand. Ex. 4 at 5. Dr. Lauro suspected "an element of adhesive capsulitis" and recommended a conservative approach, including PT, ibuprofen, and potentially a cortisone injection. *Id.* at 6.

Petitioner had her first PT session on July 27, 2020 and attended seven more PT sessions through September 30, 2020. Ex. 5 at 5-32. The physical therapist noted that

---

[5] Dr. Hennessey believed that because Petitioner's left shoulder pain was "mechanically-based," it could not be caused by the flu vaccine. Ex. 7 at 2. He also included comments to Dr. Christianson that he had previously diagnosed six cases of flu vaccine-cased neuralgic amyotrophy and personally was "never going to get the flu shot" due to low efficacy. *Id.* at 3.

4

Petitioner had tenderness in her left shoulder, decreased ROM, and muscle weakness. The physical therapist's notes do not record any complaints of tingling or numbness. *Id.* at 5-32. Petitioner was discharged from PT without completing her treatment goals when she failed to schedule any further appointments. *See id.* at 4-6.

During this time period, on August 3, 2020, Petitioner returned to Excela Orthopedics for an appointment with Dr. Lee. Ex. 3 at 3. Dr. Lee stated that Petitioner had "left shoulder pain as result of a vaccine in the left arm." *Id.* at 4. Dr. Lee agreed with Dr. Lauro that Petitioner's symptoms were consistent with adhesive capsulitis and recommended continuing PT.[6] *Id.*

On September 9, 2020, Petitioner saw a different orthopedist, Dr. Robert Wigle, at the Excela Orthopedics group. Ex. 4 at 3. Dr. Wigle diagnosed Petitioner with a "left frozen shoulder" that was "probably related" to the flu vaccine. *Id.* at 4. Dr. Wigle attempted to reassure Petitioner that steroid injections were an accepted and standard treatment, but she remained unwilling to have any injections. *See id.* Dr. Wigle also recommended more PT and diclofenac gel, or, as an alternative, manipulation under anesthesia. *Id.* In addition to her left shoulder symptoms, Petitioner also complained of a more mild pain in her right elbow, which Dr. Wigle diagnosed "classic tennis elbow." *See id.* at 3-4. Petitioner did not report any radicular symptoms in either arm. *Id.*

### D.   Petitioner Treats Other Medical Conditions for the Next Three Years With Only Intermittent Left Shoulder Treatment

After seeing Dr. Wigle and being discharged from PT, Petitioner appears to have turned her focus away from her left shoulder and instead sought renewed treatment for urinary pain and frequency, sinus pain and pressure, neck pain, and abdominal pain. From November 2020 through November 2022, Petitioner had numerous appointments with Dr. Christianson related to these issues and also went to the emergency room three times. *See* Ex. 2 at 10-73; Ex. 10 at 3-45; Ex. 14 at 128; Ex. 16 at 10-36. Petitioner also saw Dr. Christianson several times for a sore throat and COVID-19 symptoms, including post-COVID tinnitus. *See* Ex. 2 at 33; Ex. 10 at 3, 11, 26, 45.

Some of these visits involved complaints regarding the left side of Petitioner's body, although not specifically her shoulder. In particular, on November 30, 2020, Petitioner told Dr. Christianson that she had "constant pain under bilateral axilla areas that radiates down her side, with a constant ache on the left side of her chest." Ex. 2 at 69. On June 9, 2021, Petitioner reported left quadrant abdominal pain that radiated to her

---

[6] On August 4, 2020, Petitioner saw Dr. Christianson for right elbow pain that had started after picking up a cinder block the previous week. Ex. 2 at 76.

flank. *Id.* at 45. Petitioner also complained of left groin pain and left flank pain on July 12, 2021. *Id.* at 33. Further, on February 17, 2022, Petitioner described "[t]wo weeks of worsening left sided chest pain" that was intermittent, sharp, and not associated with exercise.[7] Ex. 10 at 9. Petitioner also mentioned *right shoulder* myalgia at an appointment for possible COVID-19 symptoms on November 16, 2021. Ex. 10 at 23.

The only left shoulder-related treatment that Petitioner received during this time was a series of thirteen chiropractic sessions between June 2021 and January 2022. This treatment seems to have been mainly focused on Petitioner's back and jaw pain. *See* Ex. 9 at 3-11. However, the chiropractor's notes also referenced pain in the left shoulder.[8] *Id.*

In mid-January 2023 – now a year after her last chiropractic appointment - Petitioner saw Dr. Christianson regarding her left shoulder pain. Petitioner stated that this pain "ha[d] occurred intermittently over the last three years." Ex. 14 at 21. Dr. Christianson noted that Petitioner worked as a delivery person for Walmart and "frequently lift[ed] heavy packages and soda, while loading and unloading her vehicle." *Id.* Dr. Christianson advised Petitioner to restart a previous prescription for extra-strength ibuprofen and to consider "long term anti-oxidant foods for general health and inflammation control." *Id.* at 23. DR. Christianson also suggested taking repeat x-rays and trying a steroid injection in the future. *Id.*

Thereafter, Petitioner did not seek any additional treatment for her left shoulder for another ten months, returning to Dr. Wigle on October 11, 2023.[9] Ex. 15 at 7. Dr. Wigle noted that Petitioner was "essentially unimproved" from her last appointment and found "[m]ultifactorial left shoulder pain to include elements of a frozen shoulder and impingement." *Id.* Dr. Wigle prescribed Petitioner stronger Voltaren gel, but stated that Petitioner "probably [was] not going to get very far symptom relief wise without at least a diagnostic subacromial injection." *Id.* However, Petitioner remained unwilling to try steroid injections and also felt that PT had made her symptoms worse. *Id.*

On October 20, 2023, Petitioner had an appointment at Dr. Christianson's office to request another MRI of her left shoulder because she believed the pain was now different. Ex. 14 at 7. The physician that she saw ordered the MRI and prescribed a muscle relaxer

---

[7] Dr. Christianson believed that anxiety was exacerbating Petitioner's various symptoms and suggested the use of Xanax. Ex. 10 at 9.

[8] The chiropractor's notes are handwritten and almost completely illegible.

[9] Between January 2023 and October 2023, Petitioner had several appointments with Dr. Christianson for cough and COVID-19 symptoms, as well as chest pain also possibly related to lifting heavy objects. *See* Ex. 14 at 12-21.

and a short course of oral steroids. *Id.* at 7-8. Petitioner once again declined PT or steroid injections. *Id.*

Petitioner underwent her second MRI on October 22, 2023. Ex. 13 at 21. Again, Petitioner had "[m]ild degenerative changes of the acromioclavicular joint" with "trace subacromial-subdeltoid bursal fluid." *Id.* Further, "[m]ild supraspinatus, infraspinatus, subscapularis tendinosis is either new or more pronounced when compared to the prior exam" and "[m]inimal atrophy of the cuff musculature is new when compared to the prior exam." *Id.* Petitioner did not file records of any additional left shoulder treatment after the date of this MRI.

Contemporaneous with the Petition, Petitioner filed a declaration stating simply that she received the flu vaccine in her left deltoid and suffered a left shoulder injury as a result. *See* Ex. 6 at 1. The declaration did not contain any additional details regarding the circumstances of the vaccination, the site of administration, or Petitioner's recollection thereof.

## III.    Ruling on Entitlement

### A.    Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if she has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). If a petitioner establishes a Table injury, causation is presumed.

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule

does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* at *19. The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). And the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B.   Petitioner Has Established by a Preponderance of the Evidence that She Most Likely Received the Flu Vaccine in Her Left Shoulder

In opposing entitlement, Respondent emphasizes that Petitioner's vaccination record states, without any ambiguity, that she received the flu vaccine in her *right* deltoid. Rule 4(c) Report at 3; Resp't Opp'n at 3. Although Petitioner responds that this type of document cannot always be taken at face value (as recognized in several prior decisions),[10] Pet'r Mot. at 4-7, Respondent argues that "there is no evidence whatsoever indicating that anything in the vaccination administration record is amiss." Resp't Opp'n at 5. Respondent also cautions that I should not "disregard the vaccine record which is created for the purpose of documentation." *Id.* at 3.

Respondent is of course correct about the clear reference to the right shoulder in the vaccine administration record. But this does not *per se* prevent Petitioner from establishing entitlement. I have previously remarked that "based upon my experience resolving SPU SIRVA cases (over 1,300 cases since my appointment as Chief Special Master) as well as additional SIRVA cases handled in chambers, it is not unusual for the information regarding site of vaccination in computerized systems to be incorrect." *Kosma v. Sec'y of Health & Hum. Servs.*, No. 21-0538V, 2023 WL 4843301, at *4 (Fed. Cl. Spec. Mstr. June 28, 2023) (listing exemplar cases). Systems that use a "dropdown" menu to

---

[10] *See,* e.g., *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435 (Fed. Cl. Spec. Mstr. Apr. 19, 2021); *Desai v. Sec'y of Health & Hum. Servs.*, No. 14-0811V, 2020 WL 4919777 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2018 WL 6718629 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

enter information are "often not updated each time a separate vaccine is administered to a different individual." *Id.* This computerized method of documentation "requires less effort on the part of the administrator than other methods, such as a written notation or requirement to circle left or right deltoid." *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020). Prior cases have held that "consistent reporting to treating physicians that a shoulder injury was associated with a specific vaccination in the same shoulder constitutes probative evidence that can overcome a contradictory vaccine administration form." *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *7 (Fed. Cl. Spec. Mstr. Apr. 19, 2021) (citing *Desai v. Sec'y of Health & Human Servs.*, No. 14-811V, 2020 WL 4919777, at *13-14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Mogavero v. Sec'y of Health & Human Servs.*, No. 18-1197V, 2020 WL 4198762 (Fed. Cl. Spec. Mstr. May 12, 2020)).

Here, I find that Petitioner's descriptions of receiving a left shoulder vaccination and injury to her treaters outweigh the computerized vaccination record. I give significant weight to Petitioner's initial orthopedic appointment with Dr. Lee on November 20, 2019 – six weeks post-vaccination – in which she stated that her left shoulder pain seemed to "start immediately after receiving a flu vaccine *in the left shoulder*." Ex. 3 at 5. Given Petitioner's belief that she had been "stuck in [the] bone with [the] needle," it would be unlikely that she would not correctly recount the situs of vaccination. *See id.* Petitioner's other treatment records also logically make the connection between her left shoulder symptoms and a vaccination in that same arm, even if they do not state the situs as explicitly. *See* Ex. 2 at 70, 79, 86; Ex. 3 at 3-4; Ex. 4 at 3, 5; Ex. 7 at 3.

Therefore, when the record is viewed in its entirety, the numerous medical records overcome the "single contradictory" vaccination administration record. *See Capra v. Sec'y of Health & Hum. Servs.*, No. 18-129V, 2019 WL 3717951, at *4 (Fed. Cl. Spec. Mstr. Apr. 26, 2019). This determination can be made on this record, even while crediting partially the vaccine administration record. Ultimately, the totality of evidence weighs against that record as being correct.

Respondent also accurately notes that the cases relied upon by Petitioner regarding situs determinations involved written statements or live testimony from the vaccine administrators. *See* Resp't Oppn' at 3-5 (citing *Mezzacapo*, 2021 WL 194045, at *2; *Rogers*, 2020 WL 1870268, at *4; *Stoliker*, 2018 WL 6718629, at *3). But a lack of confirmation from LPN Stercho, in the form of a witness statement, does not prevent a favorable situs finding based on the *other* record evidence. These decisions did not all suggest that this type of evidence was a requirement. I have previously found in similar circumstances that the petitioner met his burden, without testimony from any third parties, based on consistent descriptions of a vaccination in the injured shoulder in the medical

records. *See Kosma*, 2023 WL 4843301, at *5; *see also Mogavero*, 2020 WL 4198762, at *3; *Capra*, 2019 WL 3717951, at *4; *Keyes v. Sec'y of Health & Hum. Servs.*, No. 15-0845V, 2016 WL 2606645, at *2 (Fed. Cl. Spec. Mstr. Jan. 27, 2016).

I have also previously rejected Respondent's argument that the Vaccine Act prohibits me from finding that Petitioner's medical records are sufficient to carry her burden on situs where those records contain "[P]etitioner's statements to the providers, and not … independent information or other objective evidence." *See* Resp't Opp'n at 6 (citing Section 13(a)(1)). In *Rodgers*, Respondent similarly argued that a petitioner's medical records "should be given little weight since they are derived from information provided by Petitioner." 2020 WL 1870268, at *5. However, I explained that in *Cucuras*, the Federal Circuit stated that medical records in general warrant consideration as trustworthy evidence because they contain "information supplied *to* or by health professionals to facilitate diagnosis and treatment of medical conditions." *Id.* (quoting 993 F.2d at 1528) (emphasis added in *Rodgers*). "Thus, the Circuit has instructed that greater weight should be accorded to this information even when the information is provided by Petitioner." *Id.* I therefore afford substantial weight to Petitioner's description of her injury and the site of vaccine administration to her treaters because this information was "given in the interest of accurate diagnosis and treatment." *Kosma*, 2023 WL 4843301, at *5.

As a final situs-related argument, Respondent briefly contends that the 42-day gap between the vaccination and Petitioner's first report of left shoulder pain "naturally raises questions about the reliability of [P]etitioner's later report compared to the vaccination record."[11] Rule 4(c) Report at 8. However, Respondent does not elaborate on any specific concerns about Petitioner's statements to Dr. Lee. I do not find that this relatively short delay (at least in terms of other SIRVA cases) would likely cause Petitioner to forget the location of an unusually painful vaccination. Petitioner did not have any intervening appointments and never suggested any alternate cause of her injury or that she actually received the vaccine in her right arm. Therefore, Petitioner has proven situs by a preponderance of the evidence.

### C.    Petitioner Has Established that Her Pain and Reduced ROM Were Limited to Her Left Shoulder and that She Did Not Have Any Other Condition or Abnormality

Respondent next points to Petitioner's complaints of numbness and tingling in her left arm and hand, as well as refences to pain radiating from her left shoulder and left-sided neck and chest pain, as evidence that she did not suffer from a Table SIRVA. Rule

---

[11] In the response to Petitioner's motion, Respondent also appears to challenge onset based on this 42-day delay in treatment. Resp't Opp'n at 3. However, this argument is undeveloped and will not be discussed further.

4(c) Report at 9; Resp't Opp'n at 3-4. Respondent's argument blends together the third QAI element (pain and reduced ROM must be limited to the shoulder in which the vaccine was administered) with the fourth (whether there is a condition or abnormality present that would explain Petitioner's symptoms). *See* 42 C.F.R. § 100.3(c)(10)(iii)-(iv). Regardless of how this challenge is framed, it lacks sufficient weight to rule against Petitioner.

The third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossman v. Sec'y of Health and Human Servs.*, No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb 15, 2022). However, it is well-established that this QAI does not *prevent* a petitioner from succeeding merely due to the existence of "simultaneous areas of pain due to unrelated conditions . . . ." *See, e.g.*, *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Spec. Mstr. Sept. 9, 2021).

This record establishes that the Petitioner complained of pain in various locations on the left side of her body, such as her neck, flank, abdomen, and chest, both before and after vaccination. Respondent gives too much import to these distinct and unrelated issues, even asserting that Petitioner's left shoulder injury "potentially evolved into a bilateral condition by November of 2020" based on her description of pain in both axilla areas to Dr. Christianson. *See* Rule 4(c) Report at 9; Resp't Opp'n at 4. However, none of Petitioner's treaters diagnosed or assessed any of these complaints as connected to her vaccine-related left shoulder injury. These records do not provide preponderant evidence that Petitioner's condition was not limited to her left shoulder.

As to Petitioner's complaints of radiating left shoulder pain, I have previously found that claims evidencing musculoskeletal pain *primarily* occurring in the shoulder can meet the Table elements even if there are additional allegations of pain extending to adjacent parts of the body, since the *essence* of the claim remains that a vaccine administered to the shoulder primarily caused pain there. *See Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023). Here, Petitioner described pain that was primarily centered on her left shoulder, and her treatment and imaging was targeted at her left shoulder. Ex. 3 at 5. Petitioner also appears to have ceased complaining of radiating pain after September 2020. *See* Ex. 4 at 3. Overall, Petitioner's pain primarily occurred in her left shoulder and did not suggest a non-SIRVA etiology.

Petitioner's complaints of numbness and tingling in her left arm, hand, and fingers require a slightly different analysis. Petitioner cannot meet the fourth SIRVA QAI if she

had a neurological condition that would explain her symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). I have dismissed Table claims when the petitioner received primarily neurological treatment or reported her shoulder symptoms as part of a constellation of neurological issues. *See Achanzar v. Sec'y of Health & Hum. Servs.*, No. 21-2044V, 2024 WL 5298067, at *9 (Fed. Cl. Spec. Mstr. Nov. 25, 2024); *Wessinger v. Sec'y of Health & Hum. Servs.*, No. 21-518V, 2023 WL 8234551, at *8 (Fed. Cl. Spec. Mstr. Oct. 23, 2023). "Claims involving shoulder pathology in the presence of significant and potentially confounding neurologic signs and symptoms are better addressed on a causation-in-fact basis." *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023).

It is not favorable for Petitioner that she initially complained of both left shoulder pain and "occasional numbness and tingling" down to her middle and index fingers. Ex. 3 at 5. Further, in the summer of 2020, Petitioner's paresthesias in her fingers had persisted and worsened to the extent that Dr. Christianson believed there were "both neurologic symptoms and musculoskeletal symptoms here." Ex. 2 at 79-80. Dr. Christianson felt it necessary to send Petitioner to Dr. Hennessey for an NCS/EMG. *See id.* Although these test results were normal, Petitioner again mentioned a tingling sensation at her next orthopedic appointment in September 2020. Ex. 4 at 6.

However, the evidence in this case ultimately tilts in Petitioner's favor on this issue. Both before and after the ultimately fruitless investigation into a potential nerve issue, Petitioner and her treaters consistently addressed her left shoulder pain as an injury to the musculoskeletal structures of the shoulder. Petitioner's overall course of treatment was not neurological in emphasis, and she appears to have ceased complaining of tingling and numbness by the end of summer 2020. Petitioner's treaters also never "shift[ed] away" from the initial diagnosis of SIRVA/adhesive capsulitis to any kind of nerve injury. *Cf. Achanzar*, 2024 WL 5298067, at *9. Further, Petitioner's complains of shoulder pain were not "secondary" to neurologic concerns like weakness. *Cf. Wessinger*, 2023 WL 8234551, at *8. The fact that Petitioner continued to receive orthopedic treatment and continually demonstrated physical signs of a left shoulder injury on MRIs and upon examination by physical therapists and orthopedists weighs heavily in her favor. I therefore find that Petitioner has established these QAI elements by a preponderance of the evidence.

Although Petitioner's complaints of pain in other parts of her body and of tingling and numbness do not defeat entitlement, they are highly relevant for damages. Petitioner cannot receive compensation for treatment of non-SIRVA issues. Further, any of Petitioner's later symptomology that was caused by her work lifting heavy objects would also not be compensable. *See* Ex. 14 at 21. And the many instances of treatment delays

and gaps will also bear on severity, as well as what post-gap treatments are, or are not, likely associated with the SIRVA.

### Conclusion and Scheduling Order

Respondent does not raise any other objections to entitlement. *See generally id*. Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, she need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements. Section 11(c)(A), (B), and (D).

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a Table SIRVA following the October 9, 2019 flu vaccination.**

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages.

**By no later than Monday, March 9, 2026, Petitioner shall file a Status Report updating me on the parties' efforts towards informally resolving damages.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

14